Brandon S. Reif, Esq. (State Bar No. 214706)
E-Mail: Docket@ReifLawGroup.com
**REIF LAW GROUP, P.C.**
1925 Century Park East - Suite 1700
Los Angeles, California 90067
Telephone: (310) 494-6500

*Counsel for Plaintiff Dennis Nowak*

[*Additional Counsel listed on signature block*]

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

DENNIS NOWAK, an individual,

        Plaintiff,

        v.

XAPO, INC., a Delaware corporation;
XAPO (GIBRALTAR) LIMITED, a
foreign corporation;
PT INDODAX NASIONAL
INDONESIA d/b/a INDODAX, a
foreign company; and
JOHN DOE NOS. 1-10, individuals,

        Defendants.

Case No. 5:20-cv-03643-BLF

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff DENNIS NOWAK, an individual ("Plaintiff"); brings this action against XAPO, INC., a Delaware corporation; XAPO (GIBRALTAR) LIMITED, a foreign corporation; PT INDODAX NASIONAL INDONESIA d/b/a INDODAX, a foreign company; and JOHN DOE NOS. 1-10, individuals.  As grounds therefor, Plaintiff alleges the following:

## INTRODUCTION

Plaintiff alleges in this Amended Complaint claims based upon his own knowledge and acts, and based on facts obtained upon investigation by his counsel, which include, *inter alia*: (a) documents and account records maintained by Plaintiff or for his benefit, and (b) blockchain tracing and analytical reports prepared by international investigative firm Kroll.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## PARTIES

### Plaintiff

1.     Plaintiff DENNIS NOWAK is a natural person and is a resident of Willemstad, Curaçao.

### Defendants

2.     Defendant XAPO, INC. is a Delaware corporation with its principal place of business in Palo Alto, California.  XAPO, INC. provides each of its accountholders a bitcoin wallet combined with a cold storage vault and a bitcoin-based debit card.  XAPO, INC. holds client bitcoins following a full reserve banking and fully segregated model, which allows for verification that funds held by XAPO, INC. are in an individual multi-signature bitcoin address and not pooled or co-mingled with other users' funds.

3.     Defendant XAPO (GIBRALTAR) LIMITED is a foreign corporation registered and incorporated in Gibraltar with Company No. 111928.  According to

information published on its own website, XAPO (GIBRALTAR) LIMITED is licensed and regulated by the Gibraltar Financial Services Commission under the Financial Services (Electronic Money) Regulations 2011 as an "Electronic Money institution" with License No. FSC0063BNK.   Notwithstanding its Gibraltar registry, XAPO (GIBRALTAR) LIMITED has extensive ties to the United States -- including this jurisdiction -- and is essentially a United States-based entity, as management of the company's affairs are greatly guided by its team of advisors, including Lawrence H. Summers (former Secretary of the U.S. Department of the Treasury under President Bill Clinton), Dee Hock (founder of Visa), and John Reed (former Chairman and Chief Executive Officer of Citibank).

4.      XAPO, INC. and XAPO (GIBRALTAR) LIMITED commonly operate with their sibling entities around the world under the shared tradename "XAPO"; and XAPO, INC. and XAPO (GIBRALTAR) LIMITED will be collectively referred to herein simply as "XAPO," as their own website does not differentiate between the separate corporate entities.   Upon information and belief, the entities are all dominated by the same individuals, use the same corporate decision-makers, the same resources, and the same business connections.

5.      Upon further information and belief, XAPO, INC. and XAPO (GIBRALTAR) LIMITED failed to maintain arm's length relationships among the XAPO corporate entities; shared office or business locations (as needed and when needed); and interchangeably used the corporate entities to procure labor, services, or merchandise for common corporate purposes.

6.      Essentially, XAPO, INC. and XAPO (GIBRALTAR) LIMITED are one-and-the-same business, regardless of the particular name under which each company's operations are conducted. CEO Wences Casares manages and controls both XAPO, INC. and XAPO (GIBRALTAR).

7.      Both entities, while separate legal entities, act as one entity and share staff, resources, and physical presence.  For instance, XAPO (GIBRALTAR) maintains only a

3
AMENDED COMPLAINT

virtual office, with no staff or presence of its own; because in reality, XAPO, INC. and XAPO (GIBRALTAR) are one-and-the-same.

8.    XAPO (GIBRALTAR) is a mere instrumentality or alter ego of XAPO, INC.

9.    The XAPO entities do not distinguish themselves or their services on their shared website (https://xapo.com/), except in the legalese.  When the XAPO entities refer to themselves, they simply represent themselves under the shared tradename "XAPO." For example on May 5, 2020, XAPO announced: "Xapo is expanding beyond Bitcoin to become a digital bank."

10.    It is impossible to distinguish one XAPO entity from another because, as stated above, they share the same people, same resources, and same physical presence.

11.    Defendant PT INDODAX NASIONAL INDONESIA d/b/a INDODAX ("INDODAX") is a cryptocurrency exchange headquartered in Indonesia.  With more than a million users on a 24-hour trading platform, INDODAX allows its accountholders to trade bitcoin to other digital assets such as Ethereum, Litecoin, Dogecoin, DASH, Ripple, Stellar, XEM, NXT, and Bitshares.

12.    Defendants JOHN DOE NOS. 1-10 are a collection of hackers and thieves whose identities are presently unknown but who were instrumental in stealing Plaintiff's assets, storing those stolen assets in accounts held at XAPO and INDODAX which are accessible in this district and elsewhere, and exposing Plaintiff to the harm alleged in this action.  Plaintiff is working with multiple law enforcement agencies to identify the hacker(s) involved in this matter, the XAPO and INDODAX accountholders, and others involved in this theft.

13.    In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff but respecting whom Plaintiff currently lacks specific facts to permit him to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant the addition of such parties.

## **JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorneys' fees, and is an action between citizens of different states.

15.     Furthermore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treatises of the United States.   Additionally, the Court has supplemental jurisdiction over the California statutory and common law claims pursuant to 28 U.S.C. § 1337.

16.     This Court has personal jurisdiction over Defendants because: (a) at least one Defendant is operating, present, and/or doing business within this District, and (b) Defendants' breaches and unlawful activity occurred within this District.

17.     Upon information and belief, Defendants each service accountholders in this jurisdiction and reap from those accountholders large sums of money and other assets, including valuable cryptocurrency.

18.     Moreover, Defendants each either conduct business in and maintain operations in this District -- including operating computer servers and storage vaults -- or have sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper pursuant to 28 U.S.C. § 1391 in that: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (c) Defendants have received substantial compensation and other transfers of money and digital assets in this District by doing business here and engaging in activities having an effect in this District.

## GENERAL ALLEGATIONS

## I.   Background on Cryptocurrency and Cryptocurrency Exchanges

20.    Cryptocurrency[1] is a form of digital cash that enables individuals to transmit value in a digital setting.

21.    Cryptocurrency typically does not exist in physical form.  It is a digital asset designed to work as a medium of exchange wherein individual coin ownership records are stored in a distributed ledger -- a computerized database using strong cryptography -- to secure transaction records, to control the creation of additional coins, and to verify the transfer of coin ownership.  Like other assets, cryptocurrency can be used to purchase goods or services and can also be traded on exchanges.

22.    Cryptocurrency's primary function is to serve as an electronic cash system that is not owned by any one party.  Generally speaking, cryptocurrency is decentralized in that there is not a central bank or subset of users that can change the rules without reaching consensus.  Instead, the system's users run software that connects them to other participants so they can share information between themselves at all times.  Because cryptocurrency can be exchanged anywhere around the globe without the intervention of intermediaries, it is often referred to as "permissionless": anyone with an internet connection can transmit funds.  The first cryptocurrency is generally believed to be bitcoin (BTC), which was released in 2009.

23.    A person can receive cryptocurrency by generating a unique "address," which is then shared with the person who wants to send cryptocurrency.  Much like an e-mail address, a person can send cryptocurrency to another person by sending the cryptocurrency to one of his/her addresses.  Unlike an email address, though, people have many different cryptocurrency addresses; and many people use a unique address for each

---

[1] The term "cryptocurrency" is a term fashioned by combining the terms "*cryptography*" and "*currency*." This is simply because cryptocurrency makes extensive use of cryptographic techniques to secure transactions between users.

AMENDED COMPLAINT

transaction.    An    example    of    a    bitcoin    address    is 1FmwHh6pgkf4meCMoqo8fHH3GNRF571f9w.

24.    Cryptocurrency addresses are anonymous, in that the identity of a user behind the address remains unknown, unless it is revealed.

25.    Transactions between cryptocurrency addresses, however, are stored publicly and permanently.    In the case of bitcoin, all transactions between bitcoin addresses are stored on a publicly available distributed ledger called the "blockchain."

26.    Cryptocurrency exchanges are businesses that allow their customers to trade cryptocurrencies for other assets, such as other digital currencies and traditional fiat money.    To use an exchange, a customer opens an account at the exchange, then makes a deposit by sending cryptocurrency to a specific address controlled by the exchange.    The customer can then trade his/her/its cryptocurrency with other users of the exchange.

27.    Typically, cryptocurrency exchanges store their customers' cryptocurrency in several "pooling" addresses, rather than in distinct addresses for each individual customer.

28.    When a customer makes a trade on an exchange, cryptocurrency is not usually transferred between the pooling addresses.    Thus, trades on an exchange do not appear on the public blockchain.    Instead, the exchange itself maintains a database of its customers' trades.    When a customer decides to make a withdrawal, the exchange sends cryptocurrency to an address given by the customer that is outside of the exchange.    In this way, the public can see transfers *into* an exchange and withdrawals *from* an exchange, but not trades on the exchange.

29.    Because of the potential anonymity of trades on an exchange, thieves look to exchanges to launder stolen cryptocurrency.    To make it harder to launder stolen cryptocurrency -- which, in turn, reduces cryptocurrency thefts -- cryptocurrency exchanges implement "Know Your Customer" (KYC) and "Anti-Money-Laundering" (AML) policies and procedures.

30.     In the cryptocurrency industry -- just as in the financial and banking industries -- it is standard for custodial firms and exchanges to employ rigorous KYC and AML policies and procedures.

31.     KYC refers to a set of procedures and processes a cryptocurrency exchange employs to confirm the identity of its user or customer -- designed, in large part, to help thwart money laundering.   While the robustness of KYC procedures varies across companies and jurisdictions, KYC fundamentally involves the collection and verification of a customer's means of identification, including government-issued identity cards, phone numbers, a physical address, an e-mail address, or a utility bill, to name a few.

32.     In other words, transactions involving stolen cryptocurrency can be publicly identified; and if the individuals involved in a transaction can also be identified, laundering the stolen cryptocurrency becomes much harder.

33.     The general goal of AML is to ensure that firms are able to detect and prevent money laundering and to protect themselves and the financial systems in which they operate from the damage it causes.

34.     KYC is important because the risk-based approach to AML is predicated upon firms knowing who their customers are and what level of money laundering risk they present.

35.     Cryptocurrency exchanges, including the defendants in the instant matter, have long been on notice that the failure to implement proper KYC and AML procedures facilitates violations of anti-money laundering laws.  For example, in a July 26, 2017 press release announcing a $110 million fine against a cryptocurrency exchange, the acting director of the United States Treasury Department's Financial Crimes Enforcement Network ("FinCEN") warned: "We will hold accountable foreign located money transmitters, including virtual currency exchangers, that do business in the United States when they willfully violate U.S. [anti-money laundering] laws."  According to the press release, the fine was imposed, in part, because the exchange had "failed to obtain required information from customers beyond a username, a password, and an e-mail address."

36.    Cryptocurrency thieves also know that the failure to implement proper KYC and AML procedures facilitates money laundering, and they know which cryptocurrency exchanges are the laxest. Chainalysis is a blockchain analysis company that investigates financial crime and helps companies, including cryptocurrency companies, comply with Anti-Money Laundering standards.  In a study that examined cryptocurrency thefts and laundering in 2019, Chainalysis reported that it had traced $2.8 billion in bitcoin that moved from criminal entities to cryptocurrency exchanges in 2019.

37.    Failing to implement and utilize adequate KYC and AML policies and procedures is tantamount to inviting, and then turning a blind eye to, fraudulent and criminal activity.

**II.    Plaintiff's Assets Were Stolen from his Cryptocurrency Exchange Account**

38.    At all times relevant hereto, Plaintiff maintained an account at Payward, Inc. d/b/a Kraken, a Northern California-based cryptocurrency exchange ("Kraken") in which Plaintiff held, among other digital currencies, bitcoin.

39.    Kraken's business operations are based in Northern California, and it maintains numerous employees and computer servers in Northern California to conduct its business affairs.

40.    The cryptocurrency wallet in which Plaintiff maintained his assets at Kraken was accessible through those Northern California-based servers.

41.    On September 18, 2018, to prevent unauthorized access to his Kraken account, Plaintiff secured his account with a new login two-factor authentication through Google Authenticator.

42.    On or about November 20, 2018, Plaintiff deposited into his Kraken account 500 bitcoin (500 BTC) in three separate deposits: (1) a 200 BTC deposit, (2) a second 200 BTC deposit, and (3) a 100 BTC deposit.

43.     At the time Plaintiff made those deposits, the 500 BTC were valued at approximately Two Million Three Hundred Thousand Dollars ($2,300,000.00).[2]

44.     Just a few days after he had deposited the 500 BTC into his account, Plaintiff's account at Kraken was infiltrated by JOHN DOE NOS. 1-10, who withdrew all 500 BTC over the course of slightly more than two days in November 2018, *to wit*:

| Date/Time of Cryptocurrency Theft | Cryptocurrency Assets Stolen | Approximate Value of Funds/Assets Stolen on Date of Theft[3] |
| --- | --- | --- |
| November 21, 2018 10:54 a.m. | 66.99950 BTC | $305,000.00 |
| November 22, 2018 11:31 a.m. | 67.499950 BTC | $310,000.00 |
| November 23, 2018 11:49 a.m. | 66.99950 BTC | $305,000.00 |
| November 23, 2018 4:44 p.m. | 298.19950 BTC | $1,380,000.00 |
| TOTAL | 499.69845 BTC[4] | $2,300,000.00 |

45.     Undersigned counsel has engaged international investigative firm Kroll to trace the BTC transferred and withdrawn from Plaintiff's Kraken account in or about November 21-23, 2018.

46.     To be clear, the initial act of theft occurred in this jurisdiction; and the cryptocurrencies described above were transferred to INDODAX and XAPO from this jurisdiction.

---

[2] As of the date of this filing, those 500 BTC are valued at approximately Eleven Million Five Hundred Thousand Dollars ($11,500,000.00).

[3] Valuation of the stolen funds/assets is calculated using market data compiled by www.CoinMarketCap.com, which takes the volume weighted average of all prices reported at several dozen cryptocurrency markets serving investors in the United States and abroad.

[4] Transaction fees assessed on each of these unauthorized withdrawals increased the total amount withdrawn to 500 BTC.

10

AMENDED COMPLAINT

47.   As concluded by Kroll, 479.69 BTC of the 499.69845 BTC transferred from Plaintiff's Kraken account were transferred to two deposit addresses controlled by INDODAX.

48.   From those two deposit addresses, the funds were then moved to a hot wallet[5] at INDODAX where, upon information and belief, the assets are still located.

49.   The Kroll analysis further shows that as of February 7, 2020, an additional 19.99 BTC of Plaintiff's original 499.69 BTC were held in two hot wallet addresses controlled by XAPO, which are accessible on computer servers XAPO maintained worldwide but controlled by control individuals in Northern California.

50.   As such, 499.68 of the 499.69845 BTC pilfered from Plaintiff's Kraken account have been located, *to wit*:

| Owner of Source Addresses | Owner of Destination Addresses | Number of Destination Addresses | Total Estimated Amount of Funds Involved in the Event which were Sent from Source Addresses and Reached Destination Addresses |
|---|---|---|---|
| Kraken | INDODAX (*deposit addresses and hot wallets*) | 3 | 479.69 BTC |
| Kraken | XAPO (*hot wallets*) | 2 | 19.99 BTC |
| | | TOTAL | 499.68 BTC |

51.   The Kroll analysis further suggests that there has been no obvious attempt to layer the transaction in such a way as to obfuscate the destination of the funds.  Plaintiff's BTC was transferred from his Kraken account to addresses at INDODAX and XAPO in

---

[5] A "hot wallet" refers to a cryptocurrency wallet that is online and connected in some way to the Internet. A "hot wallet" stands in contrast to "cold storage," which refers to a method for electronically storing cryptocurrency in a location that is not connected to the Internet.

less than half-a-dozen steps, as shown below, where nodes represent individual addresses and arrows represent groups of transactions between those addresses:



52.     Neither Plaintiff nor any person or entity under Plaintiff's control owns or controls any of the destination addresses at INDODAX or XAPO referenced above.

**III.     Due to Faulty Security or Knowing Indifference, Stolen Cryptocurrency is Often Stored at Xapo and Indodax**

53.     In addition to Plaintiff's losses, Kroll also traced the origin of other BTC transferred to the two INDODAX deposit addresses and the two XAPO hot wallet  addresses to which Plaintiff's stolen BTC were sent; and Kroll concluded that the majority of the transfers into those four addresses came from Kraken.

12

54.     Of the estimated 1,258.85 BTC transferred from attributable sources to the two INDODAX deposit addresses, 698.72 BTC (including Plaintiff's 479.69 BTC), or over 55%, was transferred from Kraken.

55.     Of the estimated 105.4 BTC transferred from attributable sources to the two XAPO hot wallet addresses, 56.97 BTC (including Plaintiff's 19.99 BTC), or over 54% of those funds, were transferred from Kraken.

56.     As such, a further 256.01 BTC were transferred from Kraken to the same addresses that hold Plaintiff's stolen BTC.[6]

57.     As of the date of this filing, those 256.01 BTC are valued at approximately $5,888,230.00 USD, bringing the total value of the 755.69 BTC from Kraken addresses currently held in the four INDODAX and XAPO addresses to approximately $17,380,870.00.[7]

58.     The methodology of the specific theft identified by Kroll -- with funds leaving Kraken and a small split going to two XAPO wallets and the rest going to two INDODAX wallets -- appears to have been followed on more occasions than just the theft from Plaintiff, given the sums above.

59.     In the instant matter, it appears that XAPO and INDODAX have permitted criminal activity by allowing their custodial vaults and exchanges to serve as shelters for thieves like Defendants JOHN DOE NOS. 1-10 to store purloined assets.

60.     There is a simple reason why JOHN DOE NOS. 1-10 laundered the digital loot they stole through XAPO and INDODAX: despite being large cryptocurrency exchanges, XAPO and INDODAX's KYC and AML protocols are lax and do not measure up to industry standards.  JOHN DOE NOS. 1-10 were able to launder the bitcoin stolen from Plaintiff through XAPO and INDODAX because XAPO and INDODAX failed to implement security measures that were standard throughout the industry.

---

[6] 219.03 BTC transferred to the INDODAX addresses and 36.98 BTC transferred to the XAPO addresses.
[7] Using a conversion of 1 BTC = $23,000.00 USD.

61.     Beyond the four addresses at INDODAX and XAPO, Kroll's initial analysis shows that more than 2,900 BTC have been transferred from over 24,000 Kraken addresses to over 500 INDODAX addresses since January 2017 -- thus demonstrating that the Kraken-to-INDODAX movement of the BTC stolen from Plaintiff is far from an isolated incident.

62.     XAPO and INDODAX each knew that their KYC and AML policies and procedures -- including any tracing analysis of where funds originated -- were inadequate, yet the firms ignored those inadequacies and failed to adopt appropriate measures to remedy those dangerous shortcomings.     For example, Kraken knew the funds were stolen while the funds remained at XAPO and INDODAX; and any reasonable compliance standards would have revealed that.

63.     Moreover, XAPO and INDODAX each know or should have known that the assets stolen from Plaintiff and stored within their custody were indeed stolen; however, XAPO and INDODAX have undertaken no efforts to return those stolen assets to Plaintiff.

64.     Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

65.     To enforce his rights, Plaintiff has retained undersigned counsel and is obligated to pay counsel a reasonable fee for its services, for which Defendants are liable as a result of their bad faith and otherwise.

## COUNT I

### Conversion

### [against Indodax]

66.     Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

67.     In November 2018, at the time of the hack, Plaintiff owned and had the right to immediately possess the 479.69 BTC that would be laundered through INDODAX.

68.     Plaintiff owned and had the right to immediately possess his 479.69 BTC, not just a mere right to payment for the value of these bitcoin.

69.     When the stolen bitcoin was deposited by the thieves into accounts at INDODAX, INDODAX intentionally took possession of and assumed control over the 479.69 BTC.

70.     INDODAX intentionally exercised control over the bitcoin in such a way as to exclude all but the thieves from using or possessing the 479.69 BTC.

71.     INDODAX owed a duty to maintain a functional marketplace for each cryptocurrency asset traded on its exchange.

72.     Each time INDODAX intentionally took possession of and assumed control over each fraction of the 479.69 BTC, Plaintiff still owned and had the right to immediately possess that bitcoin.

73.     INDODAX knew the property it received was stolen or obtained in a manner constituting theft, both because, among other things, on information and belief, INDODAX was informed that bitcoin stolen from Plaintiff's Kraken account by law enforcement, but no later than June 2020, had been transmitted to INDODAX, and because of the suspicious volume and frequency of transactions on the INDODAX exchange as a result of the hack.

74.     As such, INDODAX wrongfully converted the 479.69 BTC.

75.     In addition, when INDODAX accepted the stolen 479.69 BTC, INDODAX was not an innocent purchaser for value in good faith, because INDODAX did not purchase those bitcoin for value, INDODAX had actual knowledge of the hackers' conversion, and INDODAX had constructive knowledge of the hackers' conversion.

76.     INDODAX had the ability to freeze accounts on the INDODAX exchange through which the hackers were engaging in transactions involving the stolen bitcoin. Upon information and belief, though, INDODAX instituted no such freeze on those accounts.

77.   As a direct and proximate result of the foregoing, Plaintiff suffered the wrongful conversion of personal property whose value exceeds $75,000.00.

## COUNT II

### Aiding and Abetting Conversion

### [against Xapo and Indodax]

78.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

79.   This cause of action asserts a claim against both XAPO and INDODAX for aiding and abetting the conversion of Plaintiff's stolen cryptocurrency assets.

80.   In November 2018, JOHN DOE NOS. 1-10 wrongfully converted 499.68 BTC from their hack into Plaintiff's Kraken account.

81.   INDODAX and XAPO owed a duty to maintain a functional marketplace for each cryptocurrency asset traded on its exchange.

82.   On information and belief, XAPO and INDODAX were informed that bitcoin was stolen from Plaintiff's Kraken account by law enforcement, but by no later than June 2020, XAPO and INDODAX had actual knowledge of the wrongful conversion and that the 499.68 converted bitcoin was being laundered through their exchanges because, among other things: (1) XAPO and INDODAX were informed that bitcoin stolen from Plaintiff's Kraken account had been transmitted to XAPO and INDODAX; (2) the volume and frequency of transactions at XAPO and INDODAX that resulted from the hack were atypical, suspicious, and raised an inference that stolen funds were being laundered through their exchanges; and (3) XAPO and INDODAX each employed atypical policies related to the opening of accounts, deposits, and withdrawals without demanding from its accountholders any meaningful identification or KYC information.

83.   XAPO and INDODAX substantially assisted and encouraged the thieves' conversion of the 499.68 BTC because, among other things: (1) XAPO and INDODAX employed atypical policies related to the opening of accounts, deposits, and withdrawals without demanding from its accountholders any meaningful identification or KYC

information; (2) XAPO and INDODAX enabled the thieves to open an unlimited number of anonymous trading accounts on their exchanges, thereby hindering detection and identification of the thieves; (3) XAPO and INDODAX refused to freeze the specific accounts used by the hackers to launder the stolen bitcoin, when XAPO and INDODAX had already learned that stolen bitcoin was being laundered through their exchanges, even though XAPO and INDODAX had the ability to identify these accounts and freeze all transactions to or from them; (4) XAPO and INDODAX continued to allow the hackers to deposit the stolen bitcoin into accounts at their exchanges, even though XAPO and INDODAX had already learned that stolen bitcoin was being laundered through their exchanges and XAPO and INDODAX had the ability to identify the transactions coming from the thieves' public addresses on the blockchain; (5) XAPO and INDODAX facilitated transactions on their exchanges of the stolen bitcoin, even though XAPO and INDODAX had already learned that stolen bitcoin was being laundered through their exchanges; and (6) upon information and belief, XAPO and INDODAX either consciously implemented policies that were inadequate to prevent money laundering, or through its employees consciously failed to follow its own policies to prevent money laundering.

84.    XAPO and INDODAX's conduct, as described above, enabled the hackers to steal Plaintiff's bitcoin and laundered the bitcoin enabling the thieves to get away with it.

85.    XAPO and INDODAX benefited from laundering the converted bitcoin, as XAPO and INDODAX earned fees on each transaction involving the converted bitcoin.

86.    As a consequence of XAPO and INDODAX's acts and omissions, Plaintiff has suffered damages.

## COUNT III

### Aiding and Abetting Fraud

### [against Xapo and Indodax]

87.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

88.     This cause of action asserts a claim against both XAPO and INDODAX for aiding and abetting the fraud perpetrated upon Plaintiff in connection with the theft and laundering of Plaintiff's stolen cryptocurrency assets.

89.     In November 2018, JOHN DOE NOS. 1-10 committed fraud to obtain and launder 499.68 BTC from Plaintiff's account at Kraken.

90.     Specifically, in November 2018, after gaining access to the account that controlled Plaintiff's bitcoin, JOHN DOE NOS. 1-10 falsely represented to Kraken that they were the actual owners of and had the right to control Plaintiff's account, including the 499.68 BTC laundered through XAPO and INDODAX.

91.     When the thieves made this false representation, they knew it was false, and they made it with the intent to defraud and induce Kraken to believe they were the actual owners of and had the right to control the bitcoin in the account.

92.     As a result, Plaintiff's 499.68 BTC laundered through XAPO and INDODAX was transferred away from account on the Kraken exchange, causing damage to Plaintiff.

93.     INDODAX and XAPO owed a duty to maintain a functional marketplace for each cryptocurrency asset traded on its exchange.

94.     Upon information and belief, XAPO and INDODAX were informed by law enforcement no later than June 2020 that bitcoin was stolen from Plaintiff's Kraken account.

95.     XAPO and INDODAX had actual knowledge of the hackers' fraud and that the 499.68 stolen bitcoin was being laundered through their exchanges because, among other things: (1) the volume and frequency of transactions on the XAPO and INDODAX exchanges that resulted from the hack were atypical, suspicious, and raised an inference that stolen funds were being laundered through their exchanges; and (2) XAPO and INDODAX employed atypical policies related to the opening of accounts, deposits, and withdrawals without demanding from its accountholders any meaningful identification or KYC information.

96.   XAPO and INDODAX substantially assisted and encouraged the cyber-thieves' fraud because, among other things:

    (a)   XAPO and INDODAX employed atypical policies related to the opening of accounts, deposits, and withdrawals, in that XAPO and INDODAX allowed new users to open accounts and transact on the exchange without demanding from its accountholders any meaningful identification or KYC information;

    (b)   XAPO and INDODAX enabled the thieves to open an unlimited number of anonymous trading accounts on its exchange, thereby hindering detection and identification of the thieves;

    (c)   XAPO and INDODAX refused to freeze the specific accounts at the exchanges used by the hackers to launder the stolen bitcoin, when XAPO and INDODAX had already learned that stolen bitcoin was being laundered through their exchanges, and when XAPO and INDODAX had the ability to identify these accounts and freeze all transactions to or from them;

    (d)   XAPO and INDODAX facilitated transactions of the stolen bitcoin on their exchanges, when XAPO and INDODAX had already learned that stolen bitcoin was being laundered through their exchanges; and

    (e)   upon information and belief, XAPO and INDODAX either consciously implemented policies that were inadequate to prevent money laundering, or through its employees consciously failed to follow its own policies to prevent money laundering.

97.   XAPO and INDODAX's conduct, as described above, enabled the hackers to steal Plaintiff's bitcoin and get away with it.

98.   XAPO and INDODAX benefited from laundering the converted bitcoin, as XAPO and INDODAX earned fees on each transaction involving the converted bitcoin.

99.   As a consequence of XAPO and INDODAX's acts and omissions, Plaintiff has suffered damages.

## COUNT IV

**Violation of California Penal Code § 496 (Possession of Stolen Property)**

**[against Indodax and John Doe Nos. 1-10]**

100.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

101.   This cause of action asserts a claim against INDODAX and JOHN DOE NOS. 1-10 for the actual theft of Plaintiff's property as well as for receiving, aiding in concealing, and withholding from Plaintiff the stolen property.

102.   In pertinent part, Cal. Penal Code sec. 496(a) imposes liability upon "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained" and provides that "[a] principal in the actual theft of the property may be convicted pursuant to this section."

103.   Furthermore, Cal. Penal Code sec. 496(c) provides: "Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

104.   Plaintiff's cryptocurrency assets were stolen from him, or were obtained by, Defendants JOHN DOE NOS. 1-10 in a manner constituting theft.

105.   Defendants JOHN DOE NOS. 1-10 knew the property was stolen.

106.   XAPO owed a duty to maintain a functional marketplace for each cryptocurrency asset traded on its exchange.

107.   On information and belief, INDODAX was informed that bitcoin was stolen from Plaintiff's Kraken account by law enforcement, but by no later than June 2020.

108.   Likewise, INDODAX knew or should have known the property was so stolen or obtained because, *inter alia*, of the suspicious volume and frequency of transactions on INDODAX as a result of the hack into Plaintiff's Kraken account.

109.   Moreover, in cryptocurrency, because of the anonymous nature of the actors engaging in transactions, exchanges act as principals in the actual theft of stolen property when that stolen cryptocurrency is received and then sent to another exchange.

110.   INDODAX received and had (and, upon information and belief, still have) possession of the property stolen from Plaintiff.

111.   INDODAX is liable to Plaintiff for three times the amount of Plaintiff's actual damages, the costs of this suit, and all reasonable attorney's fees incurred by plaintiff in connection herewith.

## COUNT V

### Violation of California's Unfair Competition Law

### [against Indodax]

112.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

113.   California's unfair competition law, California Business and Professions Code §§ 17200–17209 ("UCL"), forbids unlawful, unfair, or fraudulent conduct in connection with various types of business activities.

114.   "Unlawful" claims under the UCL may be predicated on, among others, federal statutes, federal regulations, state statutes, state regulations, local ordinances, prior case law, standards of professional conduct and common law doctrines.  For example, UCL claims may be asserted against a person for aiding and abetting wrongful conduct. See, *Chetal v. Am. Home Mortg.*, No. C 09-02727 CRB, 2009 WL 2612312, at *4 (N.D. Cal. Aug. 24, 2009); *Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008).

115.   Federal and state statutes that have no private right of action can nonetheless serve as a basis for a UCL "unlawful" violation.  *Rose v. Bank America, N.A.*, 57 Cal. 4th 390, 393 (2013); *Zhang v. Super. Ct. (Cal. Capital Ins. Co.)*, 57 Cal. 4th 364 (2013).

116.   In 2013, the United States Treasury Department's Financial Crimes Enforcement Network ("FinCEN") concluded that "virtual currency" is a form of "value that substitutes for currency," and that certain persons administering, exchanging, or using virtual currencies therefore qualify as money services businesses ("MSB") regulated under the Bank Secrecy Act, 31 U.S.C. §§ 5311-5330.  In doing so, FinCEN distinguished

those who merely use "virtual currency to purchase goods or services" (a "user") from exchangers and administrators of virtual currency, concluding that the latter two qualify as MSBs unless an exemption applies.  In both cases, such a business qualifies as a covered MSB if it: "(1) accepts and transmits a convertible virtual currency, or (2) buys or sells convertible virtual currency for any reason."

117.   Before the November 2018 hack into Plaintiff's Kraken account, and continuing to the present, INDODAX has been an MSB, as that term is defined under the Bank Secrecy Act.

118.   The BSA and its implementing regulations require MSBs to develop, implement, and maintain an effective written AML program that is reasonably designed to prevent the MSB from being used to facilitate money laundering activities.

119.   Before the hack in November 2018, INDODAX had significant knowledge of anti-money laundering standards and protocols generally recognized by cryptocurrency exchanges.

120.   In February 2012, a FinCEN-issued notice, FIN-2012-A001, explained that MSBs who deal with U.S. customers (like, in this instance, accepting cryptocurrencies from an account at a U.S. exchange) are subject to FinCEN regulations, irrespective of where they are based. Specifically, the FinCEN notice stated, in part:

> An entity may now qualify as a money services business (MSB) under the Bank Secrecy Act (BSA) regulations based on its activities within the United States, even if none of its agents, agencies, branches or offices are physically located in the United States. The Final Rule arose in part from the recognition that the Internet and other technological advances make it increasingly possible for persons to offer MSB services in the United States from foreign locations. FinCEN seeks to ensure that the BSA rules apply to all persons engaging in covered activities within the United States, regardless of the person's physical location.
> FinCEN is issuing this Advisory to advise financial institutions of their obligations under the BSA when providing financial services to foreign-located MSBs. Financial institutions should note the following:
> • To qualify as an MSB, a person, wherever located, must do business, wholly or in substantial part within the United States, in one or more of the capacities listed in 31 C.F.R. 1010.100(ff).

> Relevant factors include whether the foreign-located person, whether or not on a regular basis or as an organized or licensed business concern, is providing services to customers located in the United States.
> • Foreign-located MSBs are financial institutions under the BSA. With respect to their activities in the United States, foreign-located MSBs must comply with recordkeeping, reporting, and anti-money laundering (AML) program requirements under the BSA. They must also register with FinCEN.
> • Foreign-located MSBs are subject to the same civil and criminal penalties for violations of the BSA and its implementing regulations as MSBs with a physical presence in the United States.

INDODAX was aware of this FinCEN notice before the November 2018 hack into Plaintiff's Kraken account.

121.   In March 2013, a FinCEN-issued notice, FIN-2013-G001, titled "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies," specifically addressed the applicability of the regulations implementing the BSA to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies. FinCEN explained that "an administrator or exchanger is an MSB under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person." INDODAX was aware of this FinCEN notice before the November 2018 hack, and no limitation or exemption from the definition of "MSB" or "money transmitter" applies to INDODAX.

122.   At all times relevant to this action, INDODAX has been an "administrator or exchanger" of virtual currencies and therefore an MSB -- specifically, a money transmitter -- under FinCEN's regulations.

123.   18 U.S.C. § 1960 makes it a crime to operate an unlicensed money transmitting business. The term money transmitting includes "transferring funds on behalf of the public by any and all means including, but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile or courier." This statute makes it a violation to conduct a "money transmitting business" if the business is not registered as a

money transmitting business with the Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330, and federal regulations pursuant to that statute.  The regulations specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.  *See*, C.F.R. §§ 1010.100(f)(5), 1022.380(a)(2).  Prior to the November 2018 hack and since, INDODAX violated the law by failing to register as a money transmitting business.

124.   At all times relevant to this action, INDODAX has violated the BSA, including regulations to which MSBs are required to adhere.

125.   Prior to the November 2018 hack, INDODAX failed to comply with anti-money laundering regulations and failed to meet requirements imposed on MSBs.

126.   INDODAX's noncompliance encourages and attracts money laundering because it permits the thieves to hide their identities.

127.   INDODAX knew this prior to the November 2018 hack into Plaintiff's Kraken account but deliberately chose to ignore KYC protocols, thereby signaling to cyber-thieves that INDODAX was the place to go to launder stolen cryptocurrency.

128.   Before the hack in November 2018, INDODAX was aware that allowing people to trade and withdraw bitcoin though the INDODAX exchange without providing identification aided, abetted, and enabled money laundering.

129.   By engaging in unlawful activity before and after November 2018, including the activity described above, INDODAX engaged in unlawful conduct prohibited by the UCL.

130.   By engaging in unfair activity prohibited by the UCL, both before and after November 2018, including the activity described above, INDODAX's activity was unfair to Plaintiff inasmuch as, among other things, INDODAX's failure impose KYC requirements caused JOHN DOE NOS. 1-10 to unlawfully transfer bitcoin from Kraken to INDODAX.

131.   Any reason, motive, or justification INDODAX had for refusing to impose KYC requirements was far outweighed by the threat of harm to Plaintiff and to California's public policy against money laundering and by the actual harm that resulted.

132.   As a consequence of INDODAX's acts and omissions, Plaintiff has suffered damages.

## COUNT VI

### Negligence

### [against Xapo]

133.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

134.   California law imposes a duty to prevent purely economic loss to third parties in financial transactions. The foundational case on this subject outlines six factors for establishing a duty to protect against economic loss: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

135.   XAPO owed a duty to maintain a functional marketplace for each cryptocurrency asset traded on its exchange.

136.   On information and belief, XAPO was informed that bitcoin was stolen from Plaintiff's Kraken account by law enforcement, but for sure, no later than June 2020.

137.   XAPO owed a duty to Plaintiff and breached that duty by, among other things, failing to implement appropriate KYC and AML policies and protocols and by failing to take steps to freeze the laundering transactions/accounts or provide law enforcement with useful information about the compromised account.

138.   The laundering transactions were intended to adversely affect Plaintiff by stealing cryptocurrency from the Kraken exchange.

139.   It was foreseeable that harm to the victim of a hack -- in this instance, Plaintiff -- would occur if the hackers were provided an avenue to launder the stolen funds without having to reveal their identities

140.   There is no dispute that Plaintiff suffered injury.

141.   There is a close connection between XAPO's failure to implement proper KYC and AML policies and protocols and failure to freeze the suspicious transactions and the injury suffered.

142.   Moral blame is attached to XAPO's conduct in that before the November 2018 hack, XAPO was aware that its lax procedures facilitated money laundering through the XAPO exchange and that a failure to freeze suspicious transactions enabled money launderers to complete the laundering process while hiding their identities. To date, XAPO has not identified the identity of the thief.

143.   Public policy clearly favors preventing unlawful thefts and money laundering.

144.   As a consequence of XAPO's acts and omissions, Plaintiff has suffered damages.

## COUNT VIII

### Negligence

### [against Indodax]

145.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

146.   California law imposes a duty to prevent purely economic loss to third parties in financial transactions. The foundational case on this subject outlines six factors for establishing a duty to protect against economic loss: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to

the defendant's conduct, and [6] the policy of preventing future harm." *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

147.   INDODAX owed a duty to maintain a functional marketplace for each cryptocurrency asset traded on its exchange.

148.   On information and belief, INDODAX was informed that bitcoin was stolen from Plaintiff's Kraken account by law enforcement, but for sure, no later than June 2020.

149.   INDODAX owed a duty to Plaintiff and breached that duty by, among other things, failing to implement appropriate KYC and AML policies and protocols and by failing to take steps to freeze the laundering transactions/accounts or provide law enforcement with useful information about the compromised account.

150.   The laundering transactions were intended to adversely affect Plaintiff by stealing cryptocurrency from the Kraken exchange.

151.   It was foreseeable that harm to the victim of a hack -- in this instance, Plaintiff -- would occur if the hackers were provided an avenue to launder the stolen funds without having to reveal their identities

152.   There is no dispute that Plaintiff suffered injury.

153.   There is a close connection between INDODAX's failure to implement proper KYC and AML policies and protocols and failure to freeze the suspicious transactions and the injury suffered.

154.   Moral blame is attached to INDODAX's conduct in that before the November 2018 hack, INDODAX was aware that its lax procedures facilitated money laundering through the INDODAX exchange and that a failure to freeze suspicious transactions enabled money launderers to complete the laundering process while hiding their identities. To date, XAPO has not identified the identity of the thief.

155.   Public policy clearly favors preventing unlawful thefts and money laundering.

156.   As a consequence of INDODAX's acts and omissions, Plaintiff has suffered damages.

## COUNT IX

### Constructive Trust

### [against Xapo and Indodax]

157.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - __ above, and further alleges:

158.   This cause of action asserts a demand for imposition of a constructive trust.

159.   By reason of the fraudulent and otherwise wrongful conduct described above, XAPO and INDODAX have no legal or equitable right or interest in, or claim to, any bitcoins, property, or value that was improperly obtained from Plaintiff's Kraken account and transferred to XAPO and INDODAX.

160.   XAPO and INDODAX are involuntary trustees holding said bitcoins, property, or value -- and profits therefrom -- in constructive trust for Plaintiff with a duty to convey the same to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for relief and judgment against Defendants, as follows:

A.   An award of any and all damages recoverable under law -- jointly and severally entered against Defendants -- including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

B.   Return of Plaintiff's stolen personal property;

C.   An award of pre-judgment and post-judgment interest;

D.   An award of Plaintiff reasonable attorneys' fees, expenses, and the costs of this action; and

E.   An award granting other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all claims so triable.

## REIF LAW GROUP, P.C.

By: _/s/ Brandon S. Reif_

Brandon S. Reif (State Bar No. 214706)
1925 Century Park East - Suite 1700
Los Angeles, California 90067
Telephone:   (310) 494-6500
E-Mail:      Docket@ReifLawGroup.com

David C. Silver (Admitted *Pro Hac Vice* - DE 21)
Jason S. Miller (to be admitted *pro hac vice*)
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:   (954) 516-6000
E-mail:      DSilver@SilverMillerLaw.com
E-mail:      JMiller@SilverMillerLaw.com

*Counsel for Plaintiff Dennis Nowak*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this __21st__ day of December 2020 by using the CM/ECF system and that a true and correct copy will be served via electronic mail to: **STEVEN P. RAGLAND, ESQ., ERIN E. MEYER, ESQ., VICTOR T. CHIU, ESQ. and JASON S. GEORGE, ESQ.**, KEKER, VAN NEST & PETERS LLP, *Counsel for Defendants Xapo, Inc. and Xapo (Gibraltar) Limited*, 633 Battery Street, San Francisco, CA 94111-1809, E-mail: sragland@keker.com; emeyer@keker.com; vchiu@keker.com; and jgeorge@keker.com; and **SPENCER HOSIE, ESQ., DIANE S. RICE, ESQ., and DARRELL R. ATKINSON, ESQ.**, HOSIE RICE LLP, *Counsel for Defendant PT Indodax Nasional Indonesia*, 600 Montgomery Street - 34th Floor, San Francisco, CA 94111, E-mail: SHosie@hosielaw.com, DRice@hosielaw.com, and DAtkinson@hosielaw.com.

_/s/ Brandon S. Reif_
BRANDON S. REIF